Thank you, Your Honor. Good morning, ma'am. Please support Scott Clause Dickinson Wright on behalf of Monarch and Laurel Park. I would like to reserve four minutes of the call, Your Honor, hopefully. Watch the clock and I'll try to help you. I will, Your Honor. Thank you. In denying my clients a preliminary injunction, the district court relied upon a doctrine and upon a principle that was specifically abrogated and rejected by the United States Supreme Court nearly 25 years ago in 44 Lictor Mark v. Rhode Island. On page 7 of, that's also excerpt of record page 7, beginning at line 17, the district court cited and quoted a passage from United States v. Edge, cites Posadas v. Puerto Rico to support the proposition that Judge Tucci cited. Here is what the 44 Lictor Mark United States Supreme Court said about that passage, quote, finally, we find unpersuasive the state's contention that under Posadas and Edge, the price advertising ban should be upheld because it targets commercial speech that pertains to advice activity, end quote. The 44 Lictor Mark decision went on to say that in relying upon Posadas and in relying upon Edge in exactly the same way the district court did in this case, the government in that case, quote, mischaracterized, misread our precedent. Your honor, the district court misread United States precedent as this court established in American Trucking. Its question for today is did the court abuse its discretion in denying my court employs an erroneous legal standard? It necessarily abuses its discretion. Mr. Cross, I'm trying to understand your, this all relates to your First Amendment argument, I take it. Yes, your honor. You're not making a compelled speech argument to us. Well, your honor, the speech, I'm sorry. Your brief does not make a compelled speech argument. Your brief doesn't say the state is compelling us to speak when we don't want to. I made that argument below, but I don't see it in your briefs to us. Am I mistaken? Your honor, the point is that the regulation in question, the statute in question, does compel speech. That's not what I'm asking. I'm asking, did you make a compelled speech argument to us in your briefs? We did not rely solely on a compelled speech argument. Well, did you rely at all on it? I can't find a compelled speech argument. Your honor, under this court's precedent, a compelled speech is entitled to the same protection as- Absolutely. I understand we're missing each other here. When I first read all this, I said, gee, they might have a compelled speech argument. Then I went back and re-read your brief, and I didn't find one. Now, we're up here in the preliminary injunction. You're free to make that argument in the proceedings on the merits. We go back. My question is just a factual one. I searched through your briefs for any place where you said one of the problems with the statute is that it's compelling us to speak in places where we don't want to, and I can't find that. My question is, am I mistaken? Yes, your honor. If the court looks at page 26 of our opening brief, first line of our brief that states that the statute 5-112U violates the First Amendment is the argument that the First Amendment rights include both the right to speak freely and the right to refrain from speaking at all, and that a monarch is entitled to those First Amendment protections and that Laurel Park is entitled to those protections. Then on the next page, 27, we say the First Amendment analysis turns on the threshold question of whether the terms of ARS 5-112U actually compel plaintiffs to provide content and to speak at all. Your honor, we believe that we did make, as a matter of fact, as the lead-in to the remainder of our First Amendment analysis, we both argued that my clients have a right to refrain from speaking at all and that the statute in question actually compels my clients to provide the content and to speak at all. Well, see, when I read those pages, you're just describing what the district court rejected the claims. I think you made that claim to the district court. I don't doubt it, but then that's the district court's analysis, and then when I go on, I can't find anything in your argument that suggests the district court was wrong because you were compelled to speak. Now, I'll go back through the brief again. I don't think you need to spend time parsing it while we talk, but I understand that you raised this argument to the district court, and the district court rejected it. I just didn't see that you had raised it to us on appeal, and if I'm wrong, I'll find that in the brief, but I do have a more preliminary question for you, and it goes to your preemption argument, and I want to make sure I understand the statute correctly. The Arizona statute doesn't deal with the regulation of paramutual gaming at all, does it? The Arizona statute deals with the contracts that may be entered into and the signals that may be provided for simulcast. Right. The Arizona statute says if you provide a simulcast to one gaming location, you must provide it to all. That's correct. Or at least make it available to all, correct? That is correct. And the federal interstate paramutual gaming will be allowed. There is a nuanced answer to that question. Let me ask the question first, and then you give me your answer. So I'm trying to figure out why it is that there's any conflict between the state statutes and the federal one. Thank you. Well, here's the non-nuanced answer, Your Honor. We can't be whipsawed by the government. The government has taken the position that the simulcasts are gambling for the purposes of our First Amendment argument. They may be dead wrong. I want to ask Mr. Ervin about that when I get to it. But this is a facial attack on the statutes. And so I'm looking at the two statutes on their face, and I can't find any conflict. So tell me where I'm wrong. Sure. An outry of this court established that the touchstone for determining conflict preemption are the articulated purpose of Congress. And actually in the Interstate Horse Racing Act, Congress articulates two purposes in enacting the IHA. One is to regulate interstate paramutual wagering. But two, Congress articulated its purpose to further the horse racing industry itself. And by enacting the statute, which their simulcast signals into Arizona, except on terms and at prices determined by the commission, the 5112U acts as a complete obstacle to the articulated purpose of Congress to further the horse racing industry. And we know that because of the government's response to that argument. The government's response to that argument is if you don't like it, then don't do business in Arizona. That is an obstacle and impediment to the clear articulated purpose of Congress in enacting the IHA to further the horse racing industry. Does the state have complete discretion through the Racing Commission, not the Governor or the Attorney General, to simply say we don't want to have interstate gaming in Arizona? The state could make the decision that it did not want to allow interstate gaming in Arizona. The state has not made that decision. Okay, and my next question is, so why don't they then have the discretion to say, we'll allow interstate gaming in Arizona, but we want the providers to provide simulcasts too. Both the gaming location and the OTB. In other words, I don't think this is an argument that you can't restrict interstate gaming to Turf Paradise. You've decided to do interstate gaming with Arizona Downs. Also, the state says fine, if you're going to do that, provide the simulcasts to Arizona Downs as OTBs. Also, why can't it make that a condition? Because, Your Honor, we believe that under Davis and Hughes v. Oklahoma, the principle is that once the state makes the decision to allow the activity to occur within the borders of the state and regulate that activity, it's no answer to a conflict preemption charge to say, well, we could not allow any of that activity in the state. Could the state have approved your application to conduct paramuture wagering at Turf Paradise and its OTBs, but turned down the application to do it at Arizona Downs? I see I'm running out of time. I do want to answer. You've got plenty of time. Well, I want to make clear, neither Monarch nor Laurel Park filed an application to conduct paramuture wagering in Arizona. No, I understand. It comes from somewhere else, but could the state have turned that down? Could the state have turned down, well, the Arizona Downs application and only approved the Turf Paradise one, at least consistent with federal act? Well, the state has approved simulcast agreements by Monarch with Arizona Downs. I understand. That's not the question I asked. The question I asked is, could the state approve paramuture gaming, Laurel Park paramuture gaming, but only at Turf Paradise, not at Arizona Downs? So long as the consents under the IHA were met, yes, your honor. Okay. You wanted to save some time for rebuttal and I'll... Thank you. So I want to remind you, you can keep going if you want. Well, no, my goal today was to focus on the First Amendment argument because that was where the any arguments that Mr. Irvin makes. Thank you, your honor. Thank you, Mr. Clark. Mr. Irvin? Thank you, your honor. You can hear me now? We can. Thank you. May I please support Patrick Irvin for the apologies in this case? I think the key to this case is the Interstate Horse Racing Act. It's a question the court asked, I think, queued in on. Particularly the provision, section 3003, that no person may accept an interstate off-track wager except pursuant to the law. And one of the things the federal law requires is compliance with state law where the wager is given. So Arizona law for a wager in Arizona law. The Arizona Commission does not approve the simulcast for wagering. It is just not allowed. That's the default provision. Oh, yeah. Here's my concern about the state's position and maybe I'm missing something. Under the statute, the statute only deals with simulcasts. Am I correct? Simulcasts for the purpose of wagering. Right, for the purpose of wagering. Under Arizona law, as I read it, one could have paramutual wagering without simulcasts. Am I correct? Yes, and I think it happens. It sometimes happens. It happens with live races and certainly. Okay, but there's no requirement in Arizona law that an out-of-state race be simulcast in order to have paramutual wagering, is there? A paramutual wagering in Arizona on an out-of-state race? Yes, anything in Arizona law that says there has to be a simulcast of that race in order to have other terms of the Interstate Horse Racing Act, the simulcast is not absolutely necessary. Right, and there's nothing in the Federal Act about simulcasts. No, other than to the extent. I have no idea what the policy of the Racing Commission is. That's not in front of us at the moment, but as a matter of state law, if the commission approved paramutual wagering at the OTBs of Arizona Downs, for example, state law wouldn't also require that there be a simulcast, would it? I think to the extent it's based on a simulcast, the new law would certainly restrict. They would have to make sure that the simulcast is available to everyone. No, I understand. That's a separate issue, but so far as I understand, there's no tie-in under Arizona law between simulcasting and interstate paramutual gaming, is there? I think they certainly go together, but legally, I don't think they're joined together. Yeah, I mean, as a matter of consumer preference and as a matter of what the providers want to do, it adds to the attraction, but there's nothing under state law that requires that there be a simulcast in order to conduct paramutual gaming. Not that I'm aware of, Your Honor, but I think... Okay, I'm sorry. In the briefs, there's some reference to the state saying you can't do paramutual gaming without our simulcasts, and since we won't approve the simulcasts, we won't approve paramutual gaming, but I don't see that as part of the law. No, and I don't think it's part of this case either, Your Honor, because the entire focus has been on the simulcast, and that's what the plaintiffs, the appellants, have focused on because that's their product. As far as I know, they're not involved with facilitating interstate wagering without a simulcast. It's a package for them. It's something that they provide that includes the video content. It also includes access to betting pools in the other states. No, I understand all that. I'm just... On the conflict issue, since we have one act that only deals with gaming and another act that only deals with simulcasts, I was trying to figure out whether or not, as a legal matter, not a factual matter, there was any requirement for simulcasts in order to do gaming. Not as far as I know. The Federal Act was enacted before a lot of technology expanded what's available, but in terms of the... And it left room for the state to regulate the simulcast, and that's what the law at issue does, is it regulates... It actually regulates the permittees. It's focused on whether anyone can accept a wager, and it's the permittees who ask the Racing Commission for approval. It's the racetracks that ask for approval. And what's happened is after Judge Circi denied the preliminary injunction, both Third Paradise and Arizona Downs asked the commission to approve their simulcast contracts, which would allow them legally to accept wagering. The commission rejected that for both. And so they immediately stopped accepting wagering on race connected with the monarch simulcast, because they understand the law applies to them. It makes it illegal for them to accept wagers in Arizona on those interstate races, unless it's been approved by the Arizona Commission, and that the federal law makes that illegal if it's not approved by the commission. And so it truly is the effect... Well, there's some things in the appellate briefs that say the law doesn't apply to the permittees. It certainly doesn't. In fact, the main focus is on the racetracks in Arizona. So the thought is to say that the Arizona law does not apply for the Arizona racetracks. The monarch and Laurel Park are not able to really sell their simulcast to an Arizona racetrack that is unable to accept wages on it. And that's what distinguishes this from most of the other cases, that if monarch wishes to send its signal into Arizona, but not for the purposes of wagering, it isn't by the Arizona law. It's not prohibited by the federal law. It's only when it's actually used for wagering. And as long as the Arizona law applies to the Arizona tracks, I don't think they're ever going to accept it on the monarch simulcast, would cause problems. Because it's only if they can find a track that's willing to ignore the application of the Arizona law. And none of them... Mr. Irvin, let me... I know we took Mr. Kloss off what he wanted to talk about. So let me make the argument I think he would have made had we allowed him more time. He can correct me when he gets back up. But I think, let's assume that he's making this argument, put aside whether it's in the briefs or not. You're saying to me that if I want to speak in Arizona, and I only want to speak at Turf Paradise and its OTBs and Arizona Downs' live location, I must also speak at Arizona Downs' OTBs. I think that's the gist of the compelled speech argument, if there is one. What's your answer to that? That's what the Arizona law does. And the Arizona law really establishes the ground rules for the Arizona Commission to approve or disapprove the use of simulcast. So it's perfectly consistent with the federal act. And to the extent that monarch has the ability to not speak at all, which the federal law gives to them, because to the extent Laurel Park has its own consent rule, all the parties have consent. And as the federal district courts in Kentucky said for the Churchill Downs cases, this requires everyone to cooperate. It may lead to them not cooperating in a way that hurts their business, perhaps. But Congress has, rather than impose detailed requirements, has set it so that they all have to work it out. And this may seem odd in the sense that it gives each party, the states, the tracks, the horsemen's incredible authority, incredible negotiating power. But the cases that have addressed it have found that is what Congress meant to do. And it's allowed. So the Fairways case from the Sixth Circuit, the DeWine case, while it actually addressed the state statute that tried to rein that authority in, but the Sixth Circuit again said, that's what's allowed in the Gulf. Let me ask you again, this is a hypothetical, so I know this is not what happened here. So far as Arizona law is concerned, can Laurel Park simulcast its races anywhere it wants in the state, as long as parimutuel gaming is not occurring? It wouldn't be a simulcast, under the definition, it would just be a signal. I understand. I mean, livecast, I suppose is the right way to put it. Broadcast. I think they can send their signal anywhere. Last weekend, I was watching one of my cable sports channels and watching horse races out of Belmont, New York. And that was just on cable. I couldn't bet on them, but I could watch them. Laurel Park signal to the extent it's not used for purposes of wagering and can be sent to Arizona. There's no doubt about that. It's not regulated by the law. It's not regulated as a simulcast because by definition, a simulcast has to be for purposes of wagering. And that's really what I think is the key in this case, because that then leads into the first amendment analysis. It even leads into the commerce clause analysis because if it's being done for purposes of wagering by a permittee that has not been approved by the Arizona racing commission to accept wagers, it is illegal under federal law. It's illegal under state law. And therefore it's not protected by the first amendment. It's not really protected by the commerce clause because it's an illegal activity. So the preemption argument really is the key here. And the federal law has been written to allow Arizona to regulate with this. And then the results are very close to this. Florida has rules concerning equal access, fair distribution, as to their own signals. And both the Florida Supreme Court and the circuit court and the district court upheld that because Congress has given all these parties consent. And the state is one of the parties to consent. The appellants focus on consent by Laurel Parks, but they can certainly exercise that. And they have, as far as I know, in terms of not providing it to people they don't want to do. As I think the district court said, the Florida Supreme Court recognized that the remedy is, you don't want it given to a particular OTV or wagering location in Florida. You don't have to do business in Florida. This may seem draconian, but again, it's what Congress provided for. And it was upheld both in Fairways and in DeWine and in the Gulf Stream cases. And as I say, for now, what the plaintiff's appellants are seeking is essentially to not apply the Arizona law to the Arizona permittees. And the permittees are the ones who take the wagers. They're the ones who are subject to the law. And they are the ones who are not going to accept the simulcast in violation of the law, because they're in Arizona. And they understand that Arizona governs the law. This is an area... This case you're talking about, is this the Gulf Stream Park case? Yes. The Florida one? Okay, thank you. There's an 11th Circuit case. There's a Florida Supreme Court case, which... Yeah, no, I wanted to make sure I had the two in mind. I understand that. The District Court goes into quite a bit of detail and was affirmed on appeal. And so those cases, the Fairways cases, the Gulf Stream cases, the DeWine cases, they really allow you to see that the courts have upheld this wide discretion that Congress created for all the parties. And the Laurel Park and Marnock here are really trying to undercut the discretion the state of Arizona has, and in a way undermine the federal law itself. Their First Amendment arguments work with regard to the Arizona law. It could also work with some of the consent requirements that are actually in the federal law. And certainly the Fairways case has rejected the First Amendment as applying to these kinds of situations. And that, I think, governs here. So if you look at the preemption case, you can see Arizona has the authority to do what it did. And as I say, it may seem draconian, but Congress has created this balance, has created the consent requirements. Arizona has the consent as the ability to do that. And as of right now, Arizona has not approved the signals from Monarch. For whatever the reason, federal law says that no wagers can be accepted on those signals. And that is the default under the law. And until that changes the various, no Arizona permittee is going to be accepting these signals for wagering. So unless the court has other questions, I'll conclude with that. Let me ask my colleagues, any other questions for Mr. Irvin? No. That's it for me. Mr. Claus. Thank you, Your Honor. The first thing I want to address is Your Honor's question about the brief and your comments about the brief. And direct you to page 28 of the brief. Again, page 38 of the brief, we start on in our First Amendment argument. Because ARS 5.112U plainly compels Monarch to provide content and to speak by requiring the transmission of Monarch's simulcast signal, it is a regulation subject to scrutiny under the First Amendment. On page 38, we recapitulate. Because the only government interest in 5.12U is to compel Monarch and Laurel Park to do not wish to speak, thus suppressing their right to choose to remain silent. The government's interest in 5.112U is necessarily related to suppression of expression and fails under intermediate scrutiny. Okay, so let's assume you preserve the argument. What in the Arizona law prevents you from speaking anywhere you want? Your Honor, section 5.12U prevents us from but you can engage in precisely the same speech anywhere you want under the Arizona statute, which is say you can broadcast the race. You just can't conduct parimutuel gaming on it. Your Honor, Monarch does not conduct parimutuel wagering and neither does Laurel Park. No, I understand. The permittee cannot conduct parimutuel wagering. But there's nothing given the simulcast is defined as something on which betting is made. You can make the speech. You can broadcast the race anywhere you want in Arizona at any time. Am I correct? That is not correct, Your Honor. As long as parimutuel wagering is not occurring. That is not correct, Your Honor. And we know that is not correct. Docket 29-1 of this court, Docket 29-1, 29-2 and 29-3, we have lodged with the court and sought the court to take judicial notice of the decision by the Racing Commission to not just bar signals for the purposes of parimutuel wagering, but to bar the purpose of transmitting any signals by Monarch into the but also to the technological content providers prohibiting Monarch from distributing any signal into Arizona. And Your Honor, to say... Is that an as-applied challenge or a facial challenge? In other words, I don't see the face of the statute prohibiting that. You certainly are free to go back to the district court and say that the commission overstepped its bounds. It doesn't have that authority under the statute. But I don't see where that comes in the face of the statute. Your Honor, of course, it happened after briefing. And to get back to your point, Your Honor, when we go back to the district court, that is why it is so critically important for this court to correct the district court's manifest errors. Because lest the court think that it is now law of the case that some vice exception applies to protected First Amendment expressive activity, when that doctrine has been abrogated by the Supreme Court and by this court, there is no vice exception. The court relied on an erroneous legal standard to abuse its discretion, and that's why a preliminary injunction should be entered by this court. If the court has any other questions. Let me ask my colleagues. No. If not, we thank both counsel for their excellent briefs and arguments. This case will be submitted and we are adjourned. Thank you. This court for this session stands adjourned.
judges: Tashima, Hurwitz, Marshall